IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | |
|---|---|
| Peoria Day Surgery Center, | ) |
| Plaintiff, | ) |
| v. | ) No. 06-1236 |
| OSF Healthcare System et al., | ) |
| Defendants. | ) |

### OPINION

BEFORE U.S. MAGISTRATE JUDGE BYRON CUDMORE:

Peoria Day Surgery Center ("Peoria Day") pursues claims against OSF Health Care System d/b/a St. Francis Medical Center ("St. Francis") for alleged anticompetitive behavior. Before the Court are motions to quash and/or for protective order concerning St. Francis' subpoenas to physicians who are shareholders in Peoria Day or who have had medical staff privileges at Peoria Day. (d/e's 97, 99). Also before the Court is a Motion to Quash (d/e 102) filed by non-shareholders of Peoria Day Dr. Ahlman and Dr. Kim.

### Allegations

The relevant allegations are taken from the Amended Complaint, which sets forth federal claims under the Sherman Act, state claims under

the Illinois Antitrust Act, and state tort claims for interference with contractual relations and prospective economic advantage. (d/e 78).[1]

Peoria Day is an outpatient surgical center providing ambulatory surgeries and St. Francis' "most significant competitor" for those surgeries. (Amended Complaint, d/e 78 ¶ 22). St. Francis is one of the largest hospitals in the Peoria area and is the largest provider of ambulatory surgeries in the Peoria area. (Amended Complaint ¶ 2).

In 1990, Peoria Day entered into a contract with Caterpillar, whose beneficiaries amount to about 30% of the ambulatory surgery volume in the Peoria area. That contract designated Peoria Day as an in-network provider for Caterpillar beneficiaries.

In the mid-1990s, St. Francis entered into a "partially exclusive arrangement with Caterpillar for both in-patient and ambulatory surgery services." (Amended Complaint, d/e 78 ¶ 34). As a result, Peoria Day lost its in-network status for Caterpillar patients, except for urology services. Also in the mid-1990s, St. Francis unsuccessfully opposed Peoria Day's certificate of need to add six short-term recovery beds, pressuring

---

[1] The Amended Complaint drops the request for injunctive relief regarding contracts between St. Francis and Blue Cross-Blue Shield or United Healthcare.

physicians to withdraw their support for the certificate of need.  (Amended Complaint, d/e 78 ¶ 36).

In 2004 Caterpillar revoked Peoria Day's remaining in-network status, allegedly in response to the insistence of St. Francis.  St. Francis allegedly engineered the revocation in retaliation for Peoria Day's efforts to recruit a group of orthopedic surgeons. (Amended Complaint, d/e 78 ¶ 38-39).

Referrals to Peoria Day continued despite its removal as an in-network provider for Caterpillar beneficiaries.  This continued competition prompted St. Francis to coerce Caterpillar to stop paying for all services performed by Peoria Day as of April 1, 2006.  The reasons given for the change were pretextual.  (Amended Complaint, d/e 78 ¶ 44).  As a result, Peoria Day's revenues from Caterpillar patients dropped until March 31, 2007. (Amended Complaint, d/e 78 ¶ 57).

In addition to its efforts to exclude Peoria Day from Caterpillar's market, St. Francis also allegedly pressured physicians not to join Peoria Day, "threaten[ing] to starve . . . physicians [joining Peoria Day] . . . of referrals . . . ."  As a result, physicians have declined to join Peoria Day. (Amended Complaint, d/e 78 ¶ 9, 35-36).

## Subpoenas and Relevance

Beginning on or about December 19, 2007, St. Francis served numerous subpoenas on physicians who are shareholders in Peoria Day and on various non-shareholder physicians like Dr. Ahlman and Dr. Kim. These subpoenas are the subject of the instant motions to quash made by the physician shareholders (d/e 97), by Peoria Day (d/e 99), and by Dr. Ahlman and Dr. Kim (d/e 102), who are non-shareholder physicians.

Paraphrased, the subpoenas seek in relevant part:

●billing statements, data, explanations of benefits, and documents from payers for all ambulatory surgical procedures performed by the physician "irrespective of the location . . . ." (d/e 97, Ex. A, Requests 1-3)[2]

●documents received by the physician from Peoria Day that "relate to or refer to your use of Peoria Day's facility, including but not limited to, all requests by Peoria Day that you increase then number of ambulatory surgeries you perform at Peoria Day's facility." (d/e 97, Ex. A., Request 4)

●statements and statistics received by the physician from Peoria Day that show the types of procedures the physician performed at Peoria Day and the amounts billed for those procedures (d/e 97, Ex. A. Request 5)

---

[2]Requests two and three also appear ask for that information regardless of who performed the surgery, but St. Francis says it does not intend to pursue documents about surgeries performed by physicians who have not been subpoenaed. That objection is therefore moot.

- documents containing data on the ambulatory surgeries performed by the physician at Peoria Day, the physician's medical offices or other medical offices, area hospitals, other ambulatory surgery centers, clinics or health care facilities (d/e 97, Ex. A, Request 6)

- contracts between the physician and entities where the physician has performed ambulatory surgeries (d/e 97, Ex. A, Requests 7)[3]

The time period covered by the subpoenas is from the date the physician either became a shareholder in Peoria Day or obtained privileges there, to the date of the physician's response to the subpoena.

St. Francis asserts that this information is relevant to its defense. Specifically, St. Francis seeks to show that any asserted decline in Peoria Day's revenues and the alleged disinclination of physicians to join Peoria Day is not attributable to St. Francis, but rather to a preference by physicians, including the physician shareholders, to perform ambulatory surgeries at locations other than Peoria Day, including their own offices. St. Francis also asserts the subpoenas are "designed, in large part, to test PDS's asserted market definitions."[4]  (d/e 105, p. 2).  Peoria Day and the

---

[3] St. Francis is withdrawing its Request in number 8, mooting those objections.

[4] The parties dispute the relevant product market.  Peoria Day advances that the relevant market is ambulatory surgeries performed in hospitals or freestanding surgery centers. (Amended Complaint, d/e 78 ¶¶ 16-17).  St. Francis argues that ambulatory surgery in doctors' offices should also be included as part of the relevant market.  The information sought by St. Francis (i.e., where ambulatory surgeries have been and are

physicians do not address in any detail the relevance of the information for those purposes.

St. Francis' states in its response that it primarily seeks the location "where the physicians perform ambulatory surgical procedures, e.g., at their offices, PDS's facility, at hospitals, or at other ambulatory surgery centers." (d/e 112, p. 1). The Court agrees with St. Francis this information is arguably relevant to its defense, within the broad understanding of relevancy under Fed. R. Civ. P. 26. That does not end the inquiry, though. The Court must weigh the burden of production on the physicians against the expected benefit to St. Francis. *See* Sulfuric Acid Antitrust Litigation, 231 F.R.D. 351, 360 (N.D. Ill. 2005)(citations omitted); Fed. R. Civ. P. 26(b)(2)(C)(iii).

The physicians and Peoria Day assert undue burden, exclaiming that "to comply with St. Francis' requests, each non-party physician would have to locate, collect, and produce effectively every document pertaining to every ambulatory surgery procedure performed in the last 18 years!" (d/e 97, p. 3). Fed. R. Civ. P. 45(c)(3)(A) provides that, "On timely motion, the

---

performed) is arguably relevant to defining the product market. *See* Westerfield v. Quizno's Franchise Co., LLC, 527 F.Supp. 2d 840, 857-58 (E.D. Wis. 2007)(for general definition of relevant product market).

issuing court must quash or modify a subpoena that . . . (iv) subjects a person to undue burden." The party issuing the subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c).

Rule 45(a)(1)(c) does place limits on the production of documents pursuant to a subpoena. These limits require the documents to be in the "possession, custody, or control" of the person served.

### Shareholders

The Court agrees generally with St. Francis that the shareholders, though not named parties, do stand to economically benefit if Peoria Day succeeds and, presumably, have some ability to control the course of Peoria Day's litigation in this case. The non-shareholders (d/e 102), in contrast, have no direct economic stake in Peoria Day's revenue nor any ability to steer this litigation. Thus, balancing the relevant factors might produce different results for shareholders as compared to non-shareholders.

As to the time period covered, Peoria Day and the physicians assert that the relevant time period begins around 2004, when Caterpillar completely revoked Peoria Day's in-network status, not 1990. (d/e 97, p. 7;

d/e 99 ¶ 20).  If Peoria Day intends to limit its case to St. Francis' actions from 2004 to the present, the Court may agree.  Yet the antitrust counts in the Amended Complaint incorporate allegations dating back to the mid-1990s, when St. Francis allegedly entered into the partially exclusive contract with Caterpillar, objected to the certificate of need, and intimidated other physicians from supporting the certificate or joining Peoria Day.  Thus the relevant time frame for discovery does date back to the mid-1990's.

    The Court's initial analysis focuses on the requests in the subpoenas.  The Court's review of the subpoena requests focuses on requests numbered 1 through 3, as paraphrased by the Court above on page four.  The Court modifies requests 1 through 3 and changes the terminology irrespective of the location to read: "at any location other than Peoria Day."  As amended by the Court, a response is required.   In the Court's opinion, requests numbered 4 and 5 are more properly made by Defendant directly to Peoria Day.  Requests 4 and 5 talk about information received <u>from</u> Peoria Day.  Therefore, the Motion to Quash (d/e 97) as it relates to

requests 4 and 5 is allowed. Defendant should make those requests that it deems appropriate directly to Peoria Day.[5]

Focusing on requests numbered 6 and 7 of Defendant's subpoenas, requests numbered 6 and 7 are again limited by the Court to locations or entities other than Peoria Day. The motion to quash is denied in all other respects.

It is the Court's opinion that the information sought that is in the hands of Peoria Day is more easily obtainable from Peoria Day's records than from the shareholder physicians. Thus, the limitation imposed by the Court. However, Plaintiff Peoria Day would not have information about ambulatory surgeries performed at other locations by the physicians, nor would Plaintiff have physician contracts with the other ambulatory surgery entities.

The Court's bottom line is as follows: If the documents sought can be obtained directly from Plaintiff Peoria Day, then Defendant must make an initial request from Plaintiff before any supplemental requests via supplemental subpoena to shareholder physicians or non-shareholder physicians. This is a fairness approach. It is the right thing to do. And, it is

---

[5]Peoria Day's response clearly makes this same argument to the Court that the requests should be made directly to the Plaintiff and not to the physician shareholders.

the Court recognizing that certain requests for production would be an undue burden on the shareholder physicians and/or the non-shareholder physicians.

In this ruling the Court puts some weight on the affidavits filed by certain shareholder physicians. Two shareholder physicians submit affidavits attesting to the excessive time and expense responding to the subpoenas would require (d/e 97, Exs. B & C). The particular situations of these two physicians does not automatically generalize to all the physician shareholders. The burden on a particular physician will depend on several factors, including the existence and type of billing system used, the electronic searches allowed by those systems, the number of locations of ambulatory surgeries performed by the physicians, and the time period that the physician was associated with Peoria Day.

As to the two physician shareholders who do provide affidavits, Dr. Stuart and Dr. Smith, they assert that the subpoenas will require a manual review of every patient chart. (Dr. Smith Aff. ¶ 5)(Dr. Stuart Aff. ¶¶ 6-7). The Court is not going to compel the shareholder physicians or their staff to manually cull through 18 years of individual patient files at their own expense, but that does not appear to be what St. Francis seeks. Dr. Stuart

and Dr. Smith do not address whether their current or prior computer systems can generate surgery tracking data or surgery schedules. This information would go a long way in satisfying St. Francis' primary aim, possibly reducing or eliminating its need for additional documents. Additionally, St. Francis offers to "arrange for and provide the personnel needed to review and copy responsive documents . . . , if, in fact, any physician lacks the resources to do so." (d/e 105, p. 4). Thus, the exact cost and burden of production cannot be determined on this record.

The physicians also assert that Northwestern Memorial Hospital, 362 F.3d 923 (7th Cir. 2004) supports quashing the subpoenas, because the patients' interest in privacy outweighs any probative value of the records sought. (d/e 97, ¶ 17). Northwestern involved subpoenas from the Department of Justice for the medical records of patients who had certain late term abortion procedures. Unlike here, repeated questioning of the Northwestern lawyer about the need for the documents "drew a blank." 362 F.3d at 927. The "dearth of probative value" was therefore easily outweighed by privacy concerns. Id.

Here, St. Francis does identify what it hopes to learn from the subpoenaed information and the relevance of that information to its

defense. Further, it is not clear that patient privacy concerns are even present here. The physicians may be able to produce satisfactory summaries or lists of the surgery tracking and scheduling without endangering patient privacy. There is also a protective order in place that covers protected health information, which the Court expressly makes applicable to documents provided by non-parties as well as parties.

In short, the affidavits of Dr. Stuart and Dr. Smith do not establish undue burden with sufficient specificity to balance that burden against St. Francis' interest in obtaining the information. Too many questions remain unanswered to conclude that the subpoenas, even <u>as limited by the Court herein</u>, inflict the kind of undue burden, expense or privacy intrusion to warrant quashing them in their entirety, which is the relief sought.

The shareholder physicians ought to be able to respond to the subpoenas <u>as limited by the Court herein</u> with sufficient information to enable St. Francis to determine its next course of action. If documents are no longer in existence or are not in the possession or control of a physician, that fact can be stated. For example, Dr. Stuart avers that the billing system used by his group from 1990-1995 is no longer available, and both physicians maintain that explanations of benefits are stored for

only seven years.[6] Likewise, Dr. Smith maintains that some documents are possessed by insurance companies and other facilities. (Dr. Smith Aff. ¶ 4). This information cannot, as a practical matter, be compelled from Dr. Smith or Dr. Stuart.

In sum, if documents no longer exist, are not in the physician's possession or control, or obtaining them is too costly and time-consuming, those facts may be stated in the response, along with detailed explanations of what efforts would be required to acquire the information, how long it would take, and how much it would cost. St. Francis will then have to decide how to proceed and the Court will have a more complete record to conduct the required balancing in the event St. Francis files a motion to compel.

### Non-Shareholders

Two of the non-shareholder physicians have joined in Peoria Day's motion to quash, Dr. Ahlman and Dr. Kim (d/e 102). Both are employees of

---

[6]Dr. Stuart also avers that the billing system used from 1995 to February 2004 is no longer available but apparently might be retrieved by hiring a third party vendor at an unspecified cost. (Dr. Stuart Aff. ¶ 5). Dr. Smith avers that "certain billing data and explanations of benefits are maintained on computer systems and software that is no longer supported," but he does not identify the data or systems, nor does he specify what can reasonably be compiled that is responsive to the subpoena. (Dr. Smith Aff. Para. 4).

Anesthesia Specialties Alliance, S.C. ("ASA") and have privileges at Peoria Day.  (d/e 102, Ex. C).

St. Francis asserts that only two out of 66 non-shareholder physicians have objected to the subpoenas (Dr. Ahlman and Dr. Kim).  The Court agrees with St. Francis that Peoria Day does not have standing to assert objections on behalf of those non-shareholder physicians.  Accordingly, the subpoenas issued to the non-shareholder physicians, other than to Dr. Ahlman and Dr. Kim, are not before the Court.  Peoria Day's motion (d/e 99) is denied.

The Court has compared the subpoenas served on non-shareholder physicians with those subpoenas served on shareholder physicians.  They are identical.  Therefore, the same exact limitations imposed by the Court relating to requests numbered 1 through 7 concerning Defendant's subpoena to shareholder physicians shall apply with equal force to Dr. Ahlman and Dr. Kim.

Dr. Ahlman and Dr. Kim submit the affidavit of the business manager for ASA, Ronica Joiner.  Ms. Joiner avers that "[m]any of the documents requested by the subpoena are no longer located with the offices . . . and are not readily accessible as the computer billing and filing system for the

office was converted and updated approximately eighteen months ago." (Joiner Aff. ¶ 6). The old system would have to be "brought back to the office at a significant cost of time and money . . ." and each document would need to be individually reviewed for compliance, redactions and HIPAA laws. Id. ¶ 7-9. Ms. Joiner also avers that the explanation of benefits is kept in Massachusetts, which would require a third party vendor to review and retrieve the documents. Id. ¶ 9. She "estimate[s] that it would take several weeks to gather, review and redact the documents." Id. ¶ 10.

    As St. Francis points out, Ms. Joiner's affidavit does not address the existence of surgery data and tracking, like that done by Peoria Day. Specific patient information may be inaccessible, but statistical summaries of surgeries performed, amounts billed, and locations of those surgeries may be obtainable without individually searching patient files. This could obviate St. Francis' need for documents that would be more burdensome to obtain. St. Francis also offers to provide the necessary personnel which would decrease the burden.

    In short, like Dr. Stuart and Dr. Smith, Dr. Ahlman and Dr. Kim have not shown that responding to the subpoenas as limited by the Court

imposes an undue burden on them.   As with the shareholder physicians, Dr. Ahlman and/or Dr. Kim should be able to sufficiently respond to the subpoenas as limited by the Court.  St. Francis attaches examples of responses by other non-shareholder physicians that support that conclusion. (d/e 105, attachments)[7].

Dr. Ahlman and Dr. Kim also assert privacy concerns and HIPAA.  As discussed above, the Court believes those concerns are addressed by the protective order in place (d/e 37) which this order will make clear is applicable to information produced by non-parties pursuant to subpoena. The non-parties may file their own proposed protective order if they believe necessary to protect those interests.

WHEREFORE, Plaintiff's Motion for a Protective Order or, in the Alternative, to Quash Subpoenas (d/e 99) is DENIED;  Motions to quash (d/es 97, 102) are ALLOWED in part and DENIED in part.  By June 1, 2008, the physicians shall respond to the subpoenas in accordance with this order.  All subpoenaed information, along with the person to whom the subpoena is directed and his or her legal counsel, shall be subject to and

---

[7]Many of the responses do not appear to provide information about the ambulatory surgeries performed in other locations, such as the physician's office or hospitals, but St. Francis has not filed a motion to compel.

covered by the protective order of February 9, 2007 (d/e 37).  Subpoenaed persons may file their own proposed protective order by April 15, 2008.

ENTER:    March 17, 2008

*s/ Byron G. Cudmore*

_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE