## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PEORIA DAY SURGERY CENTER, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 06-1236** |
| | ) | |
| OSF HEALTHCARE SYSTEM, an Illinois | ) | |
| not-for-profit corporation d/b/a SAINT | ) | |
| FRANCIS MEDICAL CENTER, | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

Now before the Court is Defendant OSF Healthcare System's, an Illinois not-for-profit corporation d/b/a Saint Francis Medical Center ("SFMC"), Motion for Summary Judgment. For the reasons set forth below, SFMC's motion is GRANTED IN PART and DENIED IN PART.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claims asserted in the Second Amended Complaint present federal questions under Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"). This Court has supplemental jurisdiction over the claims asserted under Illinois state law pursuant to 28 U.S.C. § 1367, as they are so related to the claims within the Court's federal question jurisdiction that they form part of the same case or controversy.

### BACKGROUND

Plaintiff Peoria Day Surgery Center ("PDSC") is a freestanding ambulatory surgery center

1

("ASC")[1] in Peoria, Illinois.  In 2008, PDSC performed over 5,700 outpatient ambulatory surgeries.

Defendant SFMC, the largest of three hospitals in Peoria, has a main facility offering general acute

inpatient hospital services.  SMFC also controls the Center for Health ("CFH")[2], an ASC, in Peoria.

The CFH opened in 2001 and performed over 14,600 outpatient ambulatory surgical procedures in

2004, making SFMC currently the largest provider of outpatient ambulatory surgeries in Peoria.

     The facts of this case go back to the early 1990s.  At that time, all three hospitals in Peoria

offered outpatient ambulatory surgery at their main facilities, and none had freestanding ASCs.

PDSC originally opened as Peoria Urological Associates ("PUA")[3], a medical practice group and

freestanding ASC in Peoria performing urological surgery.  PDSC eventually expanded the types

of surgeries it performed and increased its number of shareholders to include other physicians who

would perform their specialties' surgeries there.  The last group to purchase shares in PDSC was

Midwest Urological Group ("MUG") in 2007.  Other Peoria ASCs in the early 1990s included

Orthopedic Institute of Illinois ("OII") and Peoria Ambulatory Surgery Center.

---

[1] Basically, an ASC is a permanent non-hospital facility equipped for the performance of surgical procedures on an outpatient basis.  For example, PDSC and SFMC provide urological and orthopedic surgeries at their ASCs.

[2] SFMC wholly-owned the CFH until 2007 when it entered into a joint venture with certain physician groups who purchased a 40% ownership interest.

[3] SFMC disputes that PUA is the predecessor of PDSC, stating that "the entity named as plaintiff has no recognized corporate registration with the Illinois Secretary of State or otherwise, and therefore has no predecessor.  The document referenced by plaintiff contains Articles of Amendment . . . whereby Peoria Urological Associates, S.C., changed its name to Peoria Day Surgery Center, S.C."  To the extent the dispute is one regarding misnomer, the identity of Plaintiff is clear, not misleading, and therefore the misnomer is immaterial.  *See* 19 C.J.S. *Corporations* § 792 (2009).

In July 1992, Caterpillar Inc. ("Caterpillar")[4], self-insured for its health insurance, sought to reduce its healthcare costs for its employees, retirees, and members of their families in Peoria by entering into a 5-year exclusive contract with SFMC.  The contract stated that SFMC would provide inpatient services and outpatient ambulatory surgery services, with two exceptions for the latter, for Caterpillar employees in Peoria.  SFMC and Pekin Hospital would be fully reimbursed as in-network providers of hospital services and outpatient ambulatory surgeries.  In the event a Caterpillar health plan Member chose hospital services or ambulatory surgery at a non-network facility, the Member would be responsible for 30% of the facility's allowed charges and Caterpillar would pay the remaining 70%.

The two exceptions to the exclusivity of the SFMC-Caterpillar contract provided that PUA (now Plaintiff PDSC) would be fully reimbursed as in-network for urological ambulatory procedures performed at its facility.  OII would similarly be fully reimbursed for facility charges as in-network for orthopedic ambulatory procedures.  PUA was named a Caterpillar Network Member for medical services in 1992 and the parties entered into a Letter of Understanding ("LOU") which reflected that PUA would be fully reimbursed as in-network for urological ambulatory surgeries performed at its facility.  The 1992 LOU provided that it would continue until December 31, 1992, and then could be extended by mutual agreement.  The extension of the LOU was apparently not documented.

In July 1997, SFMC and Caterpillar entered into a new 5-year exclusive contract, after Caterpillar sought proposals from all three Peoria hospitals, which again included the same

---

[4] Caterpillar is a worldwide maker of construction and mining equipment, diesel and natural gas engines, and industrial gas turbines.  http://www.cat.com/about-cat.  It's corporate headquarters are in Peoria, Illinois.  http://www.cat.com/contact.  Caterpillar employs a large number of people in the Peoria area.

exceptions for PUA and OII as did the 1992 contract.  Caterpillar continued to fully reimburse PUA

on an in-network basis for facility charges related to urological ambulatory procedures until August

1, 2004.  Caterpillar additionally reimbursed PUA 70% of its facility charges for out-of-network

non-urological ambulatory procedures performed for Caterpillar health plan Members until April

1, 2006.  The Caterpillar Member was responsible for the 30% co-pay.

In July 2001, SFMC and Caterpillar entered into the exclusive contract that forms the basis

of PDSC's antitrust claims in this litigation.  The 2001 contract was not sent out to bid as the 1997

contract had been.  The 2001 exclusive contract was similar to its 1992 and 1997 predecessors

regarding inpatient services and ambulatory surgery procedures, but contained a new clause which

stated:

> [Caterpillar] and [SFMC] agree that Ambulatory Surgery services may be provided by the
> following providers at their respective facilities.
>
> > Peoria Urological Associates . . .
> > Orthopedic Associates of Peoria . . .
>
> However, [Caterpillar] and [SFMC] agree to monitor ambulatory surgery capacity and access
> at [SFMC] on an on-going basis and mutually determine the continued need for Ambulatory
> Surgery services to be provided by the above providers.  At such time that [SFMC] can meet
> [Caterpillar's] ambulatory surgery capacity expectations, [Caterpillar] shall terminate
> arrangements with the above providers after prior discussion and notification to [SFMC].

Plf's Exh 58.  This contract was to be effective for nine years.

Also in July 2001, SFMC opened its outpatient ambulatory surgery facility, the CFH.  Then

in the fall of 2002, SFMC opened six new ambulatory surgery operating suites at the CFH.  In

March 2004, SFMC informed Caterpillar that it had sufficient capacity to perform the expected

volume of urological ambulatory procedures as contemplated by their 2001 contract.  In May 2004,

Caterpillar informed PUA (PDSC at this point) that the latter would no longer be considered in-

network for urological surgical facility charges, effective August 1, 2004. From that point on, Caterpillar would reimburse PDSC for facility charges at the out-of-network rate of 70%, with the remaining 30% to be collected by PDSC as a co-pay from Caterpillar Members.

As early as August 1997, Caterpillar notified PDSC of its continuing obligation to collect the 30% co-pay from Caterpillar health plan Members for non-network services performed by PDSC. Caterpillar again dealt with PDSC's obligation to collect the 30% co-pay in 1998, 1999, 2001, and 2005. Caterpillar further explained, on more than one occasion, that if PDSC continued to refrain from collecting the 30% co-pay, benefits provided to PDSC by Caterpillar could be reduced another 30%. Caterpillar even sent letters to its health plan Members requesting information as to whether the Members had been billed the 30% co-pay as non-network providers were required to do. In Caterpillar's and SFMC's 1992 and 1997 exclusive contracts, one provision stated that Caterpillar would monitor whether or not non-participating hospitals were billing health plan Members for the 30% co-pay and that the Members were actually making the payments. In a letter dated March 1, 2006, Caterpillar notified PDSC of its decision to no longer pay any claims for facility services at PDSC, effective April 1, 2006. Caterpillar cited that it had previously requested that PDSC have health plan Members sign statements indicating their awareness of the 30% co-pay penalty for using a non-network facility and that PDSC had failed to do so. Caterpillar also explained that an audit was conducted by a division of UnitedHealthcare, Ingenix, which revealed that PDSC was still not requiring health plan Members to pay the co-pay. The "zero-pay" status continued until April 1, 2007, when Caterpillar added PDSC to its network for all services provided, following the change in ownership of the CFH to a joint venture between SFMC and several physician groups.

5

In 2003, Midwest Orthopedic Center ("MOC") began discussions with PDSC, SFMC, and the other two hospitals in Peoria regarding a possible investment in an ASC by the MOC doctors. MOC considered a joint venture with an existing ASC or building its own. The discussions were eventually limited to a possible joint venture with PDSC or SFMC, and MOC internally considered the proposals made by each party at its directors' meetings. In a September 8, 2004, letter, MOC informed PDSC that "[a]fter review of the risks and the current potential rewards of the investment, the directors voted not to pursue the purchase of shares in [PDSC's] ASC any further." MOC and PDSC resumed negotiations in 2005, but in late 2006 MOC decided to invest in SFMC's CFH.

Also in 2003, PDSC and ChoiceCare Network, a division of Humana, entered into a contract where PDSC became a network provider of healthcare services to the ChoiceCare Network's members. The contract automatically renewed each year if it was not terminated by either party giving 90 days' prior written notice to the other. PDSC's and ChoiceCare Network's contract was renewed for 2004, 2005, 2006, 2007, and 2008. After negotiations with SFMC, Humana acquired OSF Health Plans, a subsidiary of the OSF Healthcare System, in May 2008. Humana and SFMC negotiated which ancillary providers would be included in the Humana ChoiceCare Network after the acquisition was completed. SFMC and Humana differed regarding the network restrictions that would be in place following the acquisition. In the end, five providers would be terminated, including PDSC as the only Peoria County provider listed.

On April 7, 2009, PDSC filed its Second Amended Complaint alleging a tying arrangement by SFMC in violation of Section 1 of the Sherman Act and the Illinois Antitrust Act, tortious interference with contractual relations and prospective economic advantage between PDSC and Caterpillar, tortious interference with PDSC's prospective economic advantage with MOC, and

tortious interference with contractual relations and prospective economic advantage between PDSC and Humana. Defendant SFMC has now moved for summary judgment. The matter is fully briefed, and this Order follows.

## DISCUSSION

Summary judgment should be granted where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Cain v. Lane*, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the nonmoving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Summary judgment is especially appropriate in antitrust cases where the plaintiff is unable to establish an element of the antitrust claim. *Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Companies*, 682 F.2d 660, 663 (7th Cir. 1982). Federal Rule of Civil Procedure 56(e) requires the nonmoving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324. This Court must then determine whether there is a need for trial — whether, in other words, there are any genuine factual issues that can properly be resolved only by a finder of fact because they may be reasonably resolved

7

in favor of either party. *Anderson*, 477 U.S. at 249; *Hedberg v. Indiana Bell Tel. Co., Inc.,* 47 F.3d 928, 931 (7th Cir. 1995). Finally, where a party bears the burden of proof on an issue, he or she must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993).

## I.      PDSC's Antitrust Claims

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. A claim for unlawful tying involves a seller, who has market power in a particular product or service, who requires buyers of that product or service to also purchase a second and separate product or service (the tied product) as a condition of their original purchase. *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 461 (1992).[5] A tying arrangement violates Section 1 of the Sherman Act if the "seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Id.* at 462 (citing *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503 (1969)).

### A. *Per Se* Analysis

PDSC argues that it can conclusively establish a *per se* tying violation by SFMC and proceeds to discuss that approach at length. SFMC, however, has for purposes of its Motion for Summary Judgment, *assumed arguendo* PDSC's geographic market definition, that SFMC has

---

[5] SFMC argues that PDSC improperly asks the Court to treat PDSC's claim as a classic tie where it has actually claimed bundled pricing. SFMC attempts to elevate form over substance, given the allegations, and therefore the Court will analyze PDSC's claim as one of unlawful tying.

sufficient market power, and that SFMC wrongfully forced Caterpillar into an exclusive contract in 2001.[6]  In its Motion and Reply, SFMC presents its arguments under the rule of reason, arguing that no authority exists for treating this case as a *per se* case.  This Court will therefore not undertake a *per se* analysis and consider arguments using that approach where the Defendant SFMC has not done so.[7]

### B.      Rule of Reason Analysis

Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."  *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977).  Initially, the relevant market must be defined in order to determine whether an unreasonable restraint on trade is occurring.  *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986); *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 478 (7th Cir. 1988) (controlling factor is the relevant market area in determining whether the Sherman Act has been violated); *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717, 737 (7th Cir. 2004) ("economic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic  market").  However, where the plaintiff can show the rough contours of the relevant market and that the defendant commands a substantial share of the market, direct evidence of anticompetitive effects

---

[6] In its Response to SFMC's Motion for Summary Judgment, PDSC states that SFMC has conceded the elements of a *per se* tying violation.  However, SFMC has only assumed some of those elements for purposes of its motion.  *See* SFMC's MSJ p. 50.

[7] SFMC does not concede or even assume a *per se* tying violation as a result of its 2001 exclusive contract with Caterpillar.  Instead, it disputes the applicability of the *per se* approach and ultimately contends that PDSC has not shown the necessary anticompetitive effects in order to prevail in its tying claims.

can establish the defendant's market power without showing a precisely defined market. *Republic Tobacco Co.*, 381 F.3d at 737. Alternatively, where there is no evidence of anticompetitive effects, a plaintiff must show the defendant possesses sufficient market power to actually threaten competition. *42nd Parallel North v. E Street Denim Co.*, 286 F.3d 401, 404-05 (7th Cir. 2002).

Here, SFMC assumes, for purposes of its motion, PDSC's geographic market definition which includes parts of Peoria, East Peoria, West Peoria, and Bartonville covered by the zip code 616. The Court will therefore use that geographic market at this summary judgment stage in addressing the parties' dispute over whether PDSC can show anticompetitive effects of the 2001 SFMC-Caterpillar exclusive contract.

In order to succeed on its antitrust claims, PDSC must establish that anticompetitive effects resulted from the 2001 SFMC-Caterpillar exclusive contract, whether those effects are in the form of consumer injury or injury to competition. See *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1988) (explaining that antitrust laws were enacted for the protection of competition rather than individual competitiors); 961 F.2d 667, 670 (7th Cir. 1992) (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)) (antitrust injury doctrine requires plaintiffs to show their loss comes from reduced output or raised prices to consumers); and *Stamatakis Industries, Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) (antitrust laws "protect consumers from suppliers rather than suppliers from each other"). SFMC argues that PDSC must establish both consumer injury and injury to competition, and that PDSC has failed to establish both.

SFMC argues that PDSC has only alleged harm to itself as a result of the 2001 SFMC-Caterpillar contract, and cannot point to any evidence of injury to competition. PDSC argues that SFMC's illegal conduct resulted in the exclusion and prevention of competition. PDSC specifically

points to it's expert's, Dr. Dranove, analysis of how SFMC's bundled discount failed under the *PeaceHealth* test.[8]  PDSC contends that such a failure shows how the 2001 contract would injure competition by excluding equally efficient competitors in the market.  PDSC also relies upon Dr. Dranove's identification of two other potential competitors who were allegedly harmed by not opening ASCs in Peoria and the fact that he testified that it is impossible to specifically identify other potential competitors that did not enter the market.

SFMC further argues that PDSC is unable to show that consumers suffered injuries in the form of increased prices or lower quality care.  See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 31 (1984) (abrogated in part on other grounds by *Illinois Tool Works Inc. v. Independent Ink, Inc.*, 547 U.S. 28 (2006)) (no unreasonable impact as a result of the defendant's tie where purchasers did not suffer adverse price effect nor impaired quality).  SFMC states that if anything, Dr. Dranove's reports show that Caterpillar's acceptance of the 2001 exclusive contract resulted in lower prices to Caterpillar than would have otherwise been possible in the absence of the contract. SFMC specifically argues that a lower percentage of ASCs in Peoria compared to elsewhere in

---

[8] *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 896 (9th Cir. 2008).  The *PeaceHealth* court explained:

> [B]undled discounts present one potential threat to consumer welfare that single product discounts do not: A competitor who produces fewer products than the defendant but produces the competitive product at or below the defendant's cost to produce that product may nevertheless be excluded from the market because the competitor cannot match the discount the defendant offers over its numerous product lines.

*Id.* at 904.  The *PeaceHealth* court further explained the "discount attribution" standard, and how the full amount of discounts given by the defendant are allocated to the competitive product.  *Id.* at 906.  Where the resulting price of that product is below the defendant's incremental cost to produce the competitive product, the trier of fact may find the bundled discount exclusionary for purposes of Section 2 of the Sherman Act.  *Id.*

11

Illinois is not a valid consumer injury because PDSC has failed to establish how that translates into lower quality care (a recognized consumer injury). Even if a lower percentage of ASCs means lower quality care, SFMC argues that PDSC cannot show the 2001 exclusive contract was the actual cause of that lower percentage.

PDSC responds that Dr. Dranove only went so far as to say that he did not have the data necessary to determine whether the 2001 exclusive contract led to increased prices for consumers of outpatient surgery services in Peoria. Dr. Dranove had actually testified that the 2001 exclusive contract allowed SFMC to charge higher prices than it would have given the absence of competition for all outpatient surgery procedures. PDSC points to Dr. Dranove's detailed analysis which, PDSC argues, shows that SFMC's prices for outpatient surgery generally exceeded PDSC's prices for the same surgeries by a substantial amount. PDSC contends Dr. Dranove explained that a lower percentage of ASCs in Peoria County was the "mechanism" that caused other forms of harm to consumers. Lower ASC presence allegedly meant equally or more efficient rivals were otherwise excluded from entering the market. It additionally allegedly meant that there was no pressure to reduce prices, increase consumer choice, or increase innovation.

When the record is viewed in the light most favorable to PDSC, this Court cannot say as a matter of law that SFMC is entitled to summary judgment on PDSC's antitrust claims. PDSC has presented evidence, particularly Dr. Dranove's expert opinions, which present material questions of fact as to whether SFMC's 2001 exclusive contract with Caterpillar led to anticompetitive effects. The parties additionally dispute whether SFMC had sufficient market power to actually threaten competition, and cite to facts which otherwise preclude granting SFMC's motion for summary judgment. As PDSC's Illinois Antitrust Act claim is interpreted according to federal precedent, the

12

above analysis applies to that claim as well.  Therefore, SFMC's motion for summary judgment as to Counts I and II of PDSC's Second Amended Complaint is denied.

## II.  SCMS'c Alleged Tortious Interference with Contractual Relations and Prospective Economic Advantage

Under Illinois law, a plaintiff can recover for interference with contractual relations by establishing: 1) the existence of a valid and enforceable contract between the plaintiff and another, 2) the defendant's awareness of the contract, 3) the defendant's intentional and unjustified inducement of a breach of the contract, and 4) a breach of the contract resulting in damages. *Fieldcrest Builders, Inc. v. Antonucci*, 724 N.E.2d 49, 61 (Ill. App. 1st Dist. 1999).  Recovery for tortious interference with prospective economic advantage requires a similar showing from the plaintiff: 1) the existence of a valid business relationship or expectancy, 2) defendant's knowledge of the expectancy, 3) defendant's intentional and unjustified interference that prevents the expectancy from developing into a valid business relationship, and 4) damages resulting from the interference.  *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 893 N.E.2d 981, 993 (Ill. App. 1st Dist. 2008).

### A.  PDSC and Caterpillar

Counts III and IV of PDSC's Second Amended Complaint allege that SFMC interfered with PDSC's contract and prospective economic advantage with Caterpillar to be a network provider of outpatient ambulatory surgery services to beneficiaries of Caterpillar health plans.  SFMC first argues that no written contract actually existed between PDSC and Caterpillar for in-network urological facility charges because: 1) the 1992 LOU was for "medical services" not facility charges, 2) the 1992 LOU was between PUA (not PDSC) and Caterpillar, and 3) the 1992 LOU was never extended by PUA and Caterpillar.  PDSC responds that PUA is its predecessor, making it a party

13

to the 1992 LOU, and the PDSC-Caterpillar LOU continued until August 2004.

PDSC has presented ample evidence that PUA changed its corporate name to "Peoria Day Surgery Center, S.C." making PUA PDSC's predecessor. Furthermore, the evidence shows that Caterpillar was clearly aware of the name change as it continued to deal with PDSC. SFMC was additionally clearly aware of the name change. SFMC cites the deposition testimony of Caterpillar's Beth Brosmer, NetWork Provider Relations, where she explained that the claims department at Caterpillar would receive separate claims for facility charges and procedure charges. However, nothing in the record indicates that Caterpillar would deny payment of the urological facility charges under the LOU, and limit payment to PDSC for urological "medical services" only. Therefore, SFMC's argument that the PDSC-Caterpillar LOU was limited to payment only for urological medical services fails.

SFMC argues that PDSC and Caterpillar had no written contract until 2007. PDSC responds that the 1992 LOU stated that it could be extended by "mutual agreement of the parties" and did not require a written extension. PDSC further argues that its continued submission of in-network urological procedure claims to Caterpillar, and the latter's continued payment of those claims for 12 years evidences an extension of the agreement by the parties. Under Illinois law, it is sufficient that the conduct of the contracting parties indicates an agreement to the terms of the alleged contract. *Board of Educ. of Arbor Park School Dist. No. 145, Cook County, v. Ballweber*, 451 N.E.2d 858, 861 (Ill. 1983). Therefore, PDSC (as PUA's successor) and Caterpillar had a valid contract, under which Caterpillar would reimburse PDSC as in-network for urological ambulatory procedures performed at its facility, until August 1, 2004.

SFMC then argues that Caterpillar and PDSC had no oral contract for 70% reimbursement

14

of PDSC's facility charges because the parties lacked a common understanding as to the collection of the 30% co-pay.  SFMC cites to the facts that Caterpillar continued to warn PDSC that it had an obligation to collect the 30% co-pay from health plan Members, while PDSC continued to waive it from time to time.  PDSC notes that Caterpillar was aware as early as 1997 that PDSC would not, at certain times, collect co-pays from health plan Members, yet Caterpillar continued to reimburse at 70% until April 2006.  Ultimately, PDSC has established that Caterpillar and it had an agreement regarding 70% reimbursement for facility charges for out-of-network ambulatory procedures performed for Caterpillar health plan Members where the reimbursements continued for 14 years, from 1992 until April 1, 2006.[9]

PDSC must next show that SFMC was aware of its contract with Caterpillar in order to prevail on its interference with contract claim.  The record amply demonstrates that SFMC knew of PDSC's agreement with Caterpillar regarding full reimbursement for urological procedures performed at PDSC until 2004, and 70% reimbursement for ambulatory surgery procedures through August 2006.  Significantly, the 1992, 1997, and 2001 SFMC-Caterpillar exclusive contracts list PDSC as an accepted outpatient ambulatory surgery services provider.  The evidence in the record shows that the relevant people at SFMC knew about PDSC's reimbursement agreement with Caterpillar, including SFMC's Director of Managed Care, Mary Breeden, and its Administrator, Keith Steffen.

---

[9] At the very least, PDSC has established that it had a reasonable expectation of prospective economic advantage with Caterpillar given their 14-year relationship.  See *Dowd & Dowd, Ltd. v. Gleason*, 816 N.E.2d 754, 802 (Ill. App. 1st Dist. 2004) (explaining that an at-will contract can support an action for tortious interference with prospective economic advantage and finding an expectancy given plaintiff's 15-year business relationship with the third party).  Even if this was simply an at-will contract, as SFMC contends, it would be sufficient for purposes of PDSC's claim of interference with prospective economic advantage.  *Id.*

Thirdly, PDSC must show that SFMC intentionally and unjustifiably induced Caterpillar's breach of its contract with PDSC.  "To prove that there was an intentional and unjustifiable inducement of a breach requires that the defendants' conduct be contrary or unrelated to any outweighing interest." *Bogosian v. Bd. of Educ. Of Community Unit School Dist. 200*, 73 F.Supp.2d 949, 952 (N.D. Ill. 1999).  See also *Chicago's Pizza, Inc.*, 893 N.E.2d at 994 (in the context of interference with prospective economic advantage, "plaintiffs must prove that defendant acted 'intentionally with the aim of injuring plaintiffs' expectancy'").  PDSC uses the same argument for this third element in its contractual and prospective economic advantage claims.  In regard to Caterpillar's decision to make PDSC out-of-network for urological procedures as of August 1, 2004, PDSC's position is that SFMC lied about its increased capacity.  PDSC contends that SFMC was threatened by the PDSC-Caterpillar relationship.  As a result, SFMC enforced the provision in its 2001 contract with Caterpillar which provided that once SFMC had sufficient capacity for ambulatory surgery, Caterpillar would terminate its agreement with Plaintiff.  PDSC cites internal correspondence at SFMC, one just two weeks before the termination, in which SFMC discusses its capacity constraints and a complaint from a particular medical practice that had difficulty scheduling surgery at SFMC's facilities.  PDSC additionally notes that Caterpillar told it, upon termination, that Caterpillar believed PDSC provided good care to health plan Members.  Finally, PDSC highlights the fact that SFMC provided Caterpillar with no analysis or objective proof to support its position that it had sufficient capacity as of March 2004.

In regard to Caterpillar's decision to zero-pay PDSC as of April 2006, PDSC's position is that the collection of co-pays was not required by its agreement with Caterpillar, which stated that it "may collect directly from the employee."  PDSC cites correspondence from Caterpillar to PDSC

16

in which Caterpillar indicated that if PDSC chose not to collect co-pays, Caterpillar could reduce its reimbursement payments further (rather than completely terminate their agreement).   It again notes that Caterpillar had previously known of its conduct in not always collecting the co-pays, yet Caterpillar continued to reimburse PDSC at 70% for years afterward.

SFMC states that it was privileged to act as it did in having Caterpillar terminate PDSC in regard to both the capacity and co-pay issues.  In intentional interference with contract claims, a defendant's conduct is considered "privileged" if he acts to preserve a conflicting interest which the law deems to be of equal or greater value than the contractual rights at issue.  *Guice v. Sentinel Technologies, Inc.*, 689 N.E.2d 355, 362 (Ill. App. 1st Dist. 1997).  In the context of interference with prospective economic advantage claims, a defendant is privileged to "divert business from [its] competitors generally as well as from [its] particular competitors, provided [the defendant's] intent is, at least in part, to further [its] business and is not solely motivated by spite or ill will."  *Miller v. Lockport Realty Group, Inc.*, 878 N.E.2d 171, 178 (Ill. App. 1st Dist. 2007).  SFMC explains that it rightfully communicated with Caterpillar regarding PDSC's alleged failure to collect 30% co-pays, given its interest in protecting the benefits of the bargain it rightfully negotiated with Caterpillar through their 2001 exclusive contract.  SFMC additionally points to places in the record which reveal that Caterpillar ultimately made the decision to zero-pay PDSC as a result of the latter's conduct in "writing off" health plan Members' co-pays, as proven by the Ingenix audit.[10]  No material question of fact exists as to whether SFMC was privileged to communicate with Caterpillar regarding PDSC's collection of the 30% co-pay.  SFMC was privileged where the record shows that

---

[10] Ingenix, a division of UnitedHealthcare, was hired by Caterpillar to conduct an audit of PDSC in order to determine whether PDSC was collecting the required co-pays from Caterpillar health plan Members.

17

SFMC acted, at least in part, to further its business and was not solely motivated by spite or ill will when it notified Caterpillar of PDSC's co-pay write offs.  Moreoever, the record shows that it was Caterpillar, not SFMC, that ultimately determined PDSC was writing off the co-pay and so must be placed on zero-pay status.  PDSC is therefore unable to establish that SFMC intentionally and unjustifiably interfered so as to prevent PDSC's expectancy from developing into a valid business relationship with Caterpillar.

"Acts of competition, which are never privileged include fraud, deceit, intimidation, or deliberate disparagement." *Miller*, 878 N.E.2d at 178.  SFMC points to its 2001 exclusive contract with Caterpillar which contains the capacity clause, allowing for the termination of PDSC in the event SFMC could meet Caterpillar's ambulatory surgery capacity expectations.  SFMC explains that it notified Caterpillar of its sufficient capacity at the CFH, and that Caterpillar verified the available data and was satisfied before it terminated PDSC as an in-network provider of urological services.  PDSC reiterates that SFMC was not privileged to act as it did in connection to the capacity issue where SFMC lied to Caterpillar about capacity sufficiency at the CFH.  There are some instances in the record where SFMC internally discusses capacity restraints, some just weeks before it notified Caterpillar it had sufficient capacity.  However, nothing in the record shows that following Caterpillar's termination of PDSC as in-network for urological services, Caterpillar received complaints from health plan Members or doctors as to insufficient capacity at the CFH.  Without such evidence in the record, no genuine issue of material fact exists as to whether SFMC intentionally and unjustifiably induced the breach of Caterpillar's contract with PDSC for in-network urological services where SFMC was privileged to enforce its own contractual provision with Caterpillar.  SFMC notified Caterpillar of sufficient capacity, Caterpillar followed up as it saw

18

fit, and Caterpillar ultimately notified PDSC of the in-network termination in its May 6, 2004, letter to PDSC.  Therefore, the Court finds that PDSC is unable to prove the third element of its tortious interference with contract and prospective economic advantage claims involving Caterpillar. SFMC's Motion for Summary Judgment on Counts III and IV must be granted.

### B.    PDSC and MOC

Count V of PDSC's Second Amended Complaint alleges that SFMC interfered with its reasonable expectation of entering into a valid business relationship with Midwest Orthopedic Center.  The parties' dispute is limited to the first and third elements of the tort of interference with prospective economic advantage: 1) the existence of a valid business relationship or expectancy and 3) defendant's intentional and unjustified interference that prevents the expectancy from developing into a valid business relationship.

The first element of a claim for tortious interference with prospective economic advantage "requires the plaintiff to specifically identify third parties who 'actually contemplated entering into a business relationship with the plaintiff.'" *Intervisual Communications , Inc. v. Volkert*, 975 F. Supp. 1092, 1103 (N.D. Ill. 1997) (applying Illinois law and quoting *Celex Group, Inc. v. The Executive Gallery*, 877 F. Supp. 1114, 1126 n.19 (N.D.Ill. 1995)).  SFMC argues that PDSC's claimed expectancy in entering into a business relationship with MOC was only illusory given the undisputed fact that PDSC bid its shares at too high a price to MOC and the parties never reached an agreement as to share price.  PDSC alternatively argues that MOC's hired accountant assessed the true market value of PDSC's shares and concluded that investing at PDSC's quoted price would be a reasonable investment.  Share prices aside, the record establishes that MOC actually did contemplate entering into a business relationship with PDSC.  A number of MOC's Director's

Meeting Minutes show that PDSC was often a topic of conversation as to being a potential investment opportunity.  Furthermore, Don Magiera, MOC's business manager, stated in his deposition that MOC eventually limited its focus to PDSC and SFMC.  Plf's Exh 34.  PDSC has sufficiently established the first element of its tortious interference claim in regard to MOC.

As to the third element of PDSC's tortious interference claim, defendant's intentional and unjustified interference, SFMC contends that PDSC lacks the evidence to show that MOC shareholders felt pressured or were coerced into deciding to join SFMC.  "The element of 'purposeful' or 'intentional' interference refers to some impropriety committed by the defendant in interfering with the plaintiff's expectancy . . . one may not simply sue any competitor who lures away customers. . ." as long as wrongful means are not used to interfere.  *Chicago's Pizza, Inc.*, 893 N.E.2d at 994.  SFMC notes that MOC witnesses testified to legitimate business factors behind their decision to invest in SFMC rather than PDSC, such as SFMC's size, quality, and strength of its referral network, and not to any conduct on the part of SFMC.

PDSC, on the other hand, argues that SFMC wrongfully interfered in its prospective relationship with MOC in many ways, including disparaging PDSC in Peoria's medical community,[11] misrepresenting PDSC's financial status with Caterpillar at the time in 2004 when MOC was most interested in PDSC, and providing MOC with materially false information to induce

_____

[11] PDSC alleges that SFMC's references to PDSC as the "Pee Palace" made it difficult to attract new physicians.  To the extent it alleges this to show impropriety on the part of SFMC in interfering with PDSC's expectancy with MOC, the record does not show that anyone from MOC actually heard SFMC refer to PDSC that way.  Also, PDSC's citation to SFMC's ASC Joint Venture Proposal, where it states one strategic reason for a joint venture was "to prevent the development of other ASC and inhibit the expansion of existing ASC," on its face shows nothing more than SFMC's attempt to compete and lure away customers from competitors.  Plf's Exh 51.  Such a "strategic reason" is protected under the competitor's privilege.

it to invest in SFMC rather than PDSC.  In mid-2004, SFMC's Administrator, Keith Steffen, apparently misinformed the entire SFMC medical staff (which included MOC doctors) that Caterpillar would no longer pay for any procedures performed at PDSC.  At that time in 2004, Caterpillar was still paying 70% for services performed at PDSC.  PDSC asserts that this misinformation helped convince MOC to end its negotiations with PDSC.  PDSC next cites to early 2007, after SFMC and MOC entered into a joint venture at the CFH, when MOC learned that it had received allegedly misleading information from SFMC at the time they entered into the joint venture in 2006.  PDSC and SFMC ultimately dispute whether the information that was provided to MOC before the joint venture was actually false or misleading.

Consequently, when considered in the context of the totality of the record and viewed in the light most favorable to PDSC, the Court finds that PDSC has provided evidence sufficient to create a triable issue as to whether SFMC intentionally and unjustifiably interfered so as to prevent PDSC's expectancy from developing into a valid business relationship with MOC.  See *Miller*, 878 N.E.2d at 178-79 (quoting *Soderlund Brothers, Inc. v. Carrier Corp.,* 663 N.E.2d 1 (Ill. App. 1st Dist. 1995)) (discussing unprivileged acts of competition, including fraud, and explaining that a representation is fraudulent when the utterer knows it is false in the sense in which it was intended to be understood by the recipient).  SFMC's motion for summary judgment on Count V must be denied.

### C.    PDSC and Humana

Count VI of PDSC's Second Amended Complaint alleges that PDSC had a valid and enforceable contract with Humana to be a provider of outpatient ambulatory surgery services to beneficiaries of Humana health plans.  PDSC argues that SFMC intentionally and unjustifiably

caused Humana to exclude PDSC as an ancillary provider following Humana's acquisition of OSF Health Plans.   Here, PDSC and Humana had a contract which was terminable by either party, without cause, upon 90 days' written notice to the other.  PDSC cites 7th Circuit cases explaining that under Illinois tort law, an at-will contract that has allegedly been interfered with by the defendant gives rise to an action for tortious interference with prospective economic advantage or for tortious interference with contract.  *Europlast, Ltd. v. Oak Switch Systems, Inc.*, 10 F.3d 1266, 1273-74 (7th Cir. 1993); *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999).  SFMC cites a 7th Circuit case stating the opposite.  *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005) ("Under Illinois law, '[a] defendant's inducement of the cancellation of an at-will contract constitutes at most interference with a prospective economic advantage, not interference with contractual relations.'"); see also *Dowd & Dowd, Ltd.*, 816 N.E.2d at 802.  Ultimately, because PDSC has failed to create a genuine issue of material fact as to whether SFMC intentionally and unjustifiably interfered with the PDSC-Humana contract, as discussed below, SFMC's motion for summary judgment must be granted on Counts VI and VII.

Count VII of the Second Amended Complaint alleges that PDSC had a reasonable expectation of entering into valid business relationships to provide outpatient ambulatory surgery services to beneficiaries of Humana health plans.  SFMC argues that PDSC merely pled a conclusion as to its expectation of entering into a valid business relationship with Humana and because it had an actual contract with Humana, no separate claim for interference with prospective economic advantage exists.  PDSC states that it had both a contract and valid expectancy that its relationship with Humana would continue in the future.  The record indicates that PDSC and Humana renewed their contract for network healthcare services to ChoiceCare Network's members from 2004 through

2008.  A valid business relationship or expectancy did exist between PDSC and Humana at the time of SFMC's alleged interference in 2008, given their automatic renewal of the original 2003 contract for 4 years.  *Intervisual Communications, Inc.,* 975 F. Supp. at 1103.

PDSC argues that SFMC knew of the PDSC-Humana contract at the time SFMC sought PDSC's termination as a Humana ancillary provider.  PDSC points to Mary Breeden's, SFMC's chief negotiator with Humana, internal memo where she identified PDSC as a Humana provider months before Humana's acquisition of OSF Health Plans.  SFMC contends that the record strongly supports that SFMC lacked knowledge of any PDSC-Humana contract.  Even assuming PDSC is able to present a genuine issue as to SFMC's knowledge of the PDSC-Humana contract, it fails to do so  regarding the third element of its tortious interference claims and so summary judgment must be granted in favor of SFMC on Counts VI and VII.

SFMC's position is that it did not interfere with the PDSC-Humana contract where Humana had the right to terminate PDSC as an ancillary provider on 90 days' notice without cause.  SFMC further argues that it did not interfere with PDSC's economic expectancy where the latter lacks any evidence that SFMC did anything other than compete as a healthcare provider for Humana's business.  PDSC's position is that SFMC acted wrongfully because Humana communicated to PDSC that it did not want to terminate PDSC, but its Stock Purchase Agreement with SFMC required the termination of certain providers.  PDSC further argues that SFMC targeted PDSC specifically, during and after Humana's acquisition of OSF Health Plans.  PDSC cites:  SFMC's internal reference to PDSC; Ira Rosenberg's concerns about the specificity of the clause "that would

eliminate PDSC";[12] PDSC as the only ASC identified for termination; PDSC as the only ancillary provider in Peoria County identified for termination; and the only provider actually terminated 9 months after the transaction closed.  To suggest that Rosenberg was particularly concerned about PDSC's exclusion when he wrote to Breeden regarding limitations and restrictions in the proposed Humana contract would require conjecture and involves a mischaracterization of his comments.  Furthermore, PDSC's emphasis on being the only ancillary provider terminated in Peoria County and the only ASC terminated anywhere would have more merit had the Humana-SFMC agreement not provided for the termination of four other providers in the surrounding counties.  Having viewed the record in the light most favorable to PDSC, it shows nothing more than SFMC engaged in lawful competition when it aggressively negotiated with Humana the exclusion of five ancillary providers.[13]  The Court finds that there are no genuine issues of material fact requiring resolution at trial, and summary judgment must be granted on PDSC's Counts VI and VII.

---

[12] Rosenberg, of Managed Care Resources, was hired by SFMC to assist in negotiations with Humana.  *See* Plf's Response to MSJ p. 73, ¶ 123.

[13] PDSC cites to cases where the defendant could not assert the competitor's privilege to avoid liability where the plaintiff's factual allegations for violations of the Sherman Act also formed the basis for the plaintiff's tortious interference claims.  The *Fishman* court, however, stated, "While we recognize that there are no Illinois cases which have used the Sherman Act as the basis of tort liability, we do not believe that Illinois case law precludes this result."  807 F.2d at 546, f.n. 21.  This Court will refrain from using the Sherman Act in such a manner where Illinois case law clearly provides that as long as the defendant's competitive conduct is not wrongful, the conduct is privileged.  *Miller*, 878 N.E.2d at 178-79; *Soderlund Brothers, Inc.*, 663 N.E.2d at 8; *Candalaus Chicago, Inc. v. Evans Mill Supply Co.*, 366 N.E.2d 319, 326-27 (Ill. App. 1st Dist. 1977); *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill. 2008).

**CONCLUSION**

For the reasons set forth above, Defendant SFMC's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  SFMC's Motion for Summary Judgment is granted in regard to Counts III, IV, VI, and VII.  SFMC's Motion for Summary Judgment is denied in regard to Counts I, II, and V.


ENTERED this 30th day of December, 2009.


s/Michael M. Mihm                      
Michael M. Mihm
United States District Judge